**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

MICHAEL DISABATO
AND JOHN DOES 1-36,

                    Plaintiffs,

    v.

THE OHIO STATE UNIVERSITY,

                    Defendant.

Case No. _____

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs Michael DiSabato and John Does 1-36 file this complaint against Defendant,

The Ohio State University ("OSU") and allege as follows:

### JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1334 because Plaintiffs allege claims under federal law, specifically Title IX of the

Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

2.      Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b)

because the events giving rise to Plaintiffs' claims occurred within this district.

### PRELIMINARY STATEMENT

3.      Plaintiffs bring this civil rights lawsuit under Title IX of the Education

Amendments of 1972, 20 U.S.C. § 1681, *et seq.* because OSU had actual notice of and was

deliberately indifferent to the fact that Richard Strauss, M.D., an OSU employee, tenured faculty

member, and the Associate Director of OSU's sports medicine program, sexually assaulted and

abused hundreds of male OSU student-athletes and other male OSU undergraduates for over

nineteen years.  Moreover, OSU officials aided, abetted, and actively concealed Strauss' sexual predation on OSU's students.

4.     As a threshold matter, Plaintiffs openly admit they consented to receiving medical treatment while student-athletes at OSU.  Plaintiffs, however, never invited or consented to Strauss touching them beyond what was medically necessary and appropriate.  For numerous reasons described below, Plaintiffs were not in a position to judge Strauss' clinical practices or to avoid him when seeking medical care.

5.     Strauss abused Plaintiffs during pre-season physicals and when treating them for injuries, either through the OSU Athletics Department or OSU's Sports Medicine Clinic at Student Health Services. He also sexually harassed student-athletes in the locker rooms and showers of Larkins Hall, where many teams were based, including wrestling, gymnastics, and swimming.

6.     On information and belief, OSU assigned Strauss a locker in *every room* used by teams based in Larkins Hall.

7.     OSU designated Strauss as a team physician for many sports.  Student-athletes could not avoid him if they wanted medical treatment.  OSU funneled Plaintiffs and other student-athletes to Strauss with assembly-line efficiency, whereupon Strauss cornered and sexually assaulted them. He sexually assaulted/abused most of the Plaintiffs more than once, and some wrestlers between 20-50 times.

8.     OSU concealed, intentionally ignored, or disregarded athletes' repeated reports and other widely known information that indicated Strauss was a threat to his male patients.  A Graduate Assistant Trainer who overlapped with Strauss only one academic quarter noticed "immediately" that something was "off" with Strauss.  "In her view, individuals who overlapped

with Strauss for any significant period of time would have had to have their 'ear plugged, eyes shut, and mouth closed not to realize something was off.'" *Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, Report of Perkins Coie, LLP, May 15, 2019, p. 104 ("Report"). Officials turned a blind eye to numerous red flags that Strauss was sexually abusing his patients, such as: Strauss insisted upon examining patients without any other staff being present, including students in training; Strauss performed notoriously long and thorough "hernia checks" during team physicals; frequent comments by athletes that Strauss made them drop their pants regardless of their medical needs (e.g., to get a case of cauliflower ear treated); and the fact that Strauss showered with athletes from multiple teams, often took multiple showers a day, and was assigned multiple lockers in Larkins Hall.

9.      When teams reported for pre-season physicals, Athletics Department personnel set up stations for each station of the physical. Strauss always chose to man the "hernia checks" station.  He took an extended amount of time with each patient and examined his patients in a room with the door closed. Hernia checks often took several minutes. Some Plaintiffs, however, remember Strauss checking inspecting and fondling their genitals for ten or fifteen minutes. A line would form outside of Strauss' exam room as the athletes completed the other stations and anxiously waited for Strauss to exam them. In fact, Strauss' prolonged genital exams became rather notorious. At least one team head coach requested that someone other than Strauss conduct the hernia checks for team physicals.

10.     When Plaintiffs asked Strauss why he was massaging their genitals and probing their rectums, he came up with many different medical explanations. Hernia and lymph node checks were the most common explanations.  Sometimes, Strauss placed his face so close to his patients that they could feel his breath on their genitals.  Sometimes he had them stand on tables

so his head was at crotch height. Other times he had them sit on a bench and spread their legs; he would then roll across the floor on a wheeled stool and stick his face deep between their legs to perform his exam. Sometimes Strauss would don a headlamp and turn off the room lights before putting his head inches away from patients' penises. When one Plaintiff asked Strauss to explain the room lights off/headlamp behavior, Strauss said he was checking for skin rashes and STDs. He assured the Plaintiff that this technique allowed him to perform the best possible examination for those kinds of problems.

11.    Strauss also sexually assaulted students by performing anal and rectal exams that were rigorous, lengthy, and medically unnecessary. Although less common than genital exams, they occurred frequently. They were profoundly embarrassing and humiliating. Numerous Plaintiffs were assaulted in this manner.

12.    Some of the Plaintiffs and other student-athletes reported Strauss' examination methods to team trainers – particularly football trainer Billy Hill. While precise responses differed, the gist was almost always the same: it was not a big deal. Strauss did things his way; Strauss was just being thorough; this had gone on for years. Other benign explanations were offered. Some Plaintiffs came to believe that Strauss' examinations were a necessary part of their participation in intercollegiate athletics that was like a "hazing."

13.    In April 2018, OSU authorized an independent investigation into whether Strauss had sexually abused student-athletes, and if so, the extent to which OSU knew about Strauss' conduct. On May 15, 2019, Perkins Coie, LLP issued findings from its independent investigation into Strauss' acts of sexual abuse and the degree to which OSU knew of or permitted Strauss to abuse OSU students. Titled, *Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, issued on May 15, 2019 (the "Report"), the Report substantiates many of the facts

pled in this Complaint and the previous complaints filed in other lawsuits pending before this Court.[1] *See, e.g., John Does 1 et. al. v. The Ohio State University,* Case No. 2:18-cv-00692-MHW-EPD (S.D. Ohio); *Brian Garrett et. al. v. The Ohio State University*, Case No. 2:18-00692-MHW-EPD (S.D. Ohio); *Steve Snyder-Hill et. al. v. The Ohio State University*, Case No. 2:18-cv-00736-MHW-EPD.

14.     John Does 1-36 filed anonymously in this action due to the highly personal nature of the circumstances giving rise to their claims.

15.     Plaintiffs take no pleasure in bringing this lawsuit. OSU is an esteemed institution of higher learning and a large majority of the Plaintiffs continue to love OSU dearly and remain devoted members of The Buckeye Nation.

16.     Plaintiffs were honored to represent OSU in competitive sports and did their best to continue the University's tradition of excellence.

17.     Plaintiffs attended OSU expecting the University would consistently provide them with a safe and supportive environment that would help them perform at their best, both athletically and academically.

18.     Plaintiffs believed that OSU would make patient/athlete safety one of the University's primary concerns.

19.     Team physicians like Strauss hold a special relationship of trust and confidence with the student-athletes they treat and are the most important medical professionals on an athlete's treatment team.

20.     Plaintiffs trusted OSU to act in their best interests when selecting, training, and supervising the team physicians on its faculty.

---

[1] Materials received from Ohio's Medical Board Contents are redacted from the current version of the Report.

21. Plaintiffs trusted OSU to hire physician faculty members who would respect and honor the relationship of trust and confidence that must be present between patients and their physicians.

22. Plaintiffs trusted OSU to regularly and competently evaluate the quality and integrity of the medical services Strauss provided to Plaintiffs.

23. Plaintiffs trusted OSU to investigate faithfully all circumstances that indicated a team physician was unfit to treat Plaintiffs, whether due to acts of sexual assault/abuse or incompetence.

24. Plaintiffs trusted that OSU personnel would not hide, fail to disclose, or disregard known circumstances that raised a substantial likelihood Plaintiffs and other student-athletes were being sexually assaulted, abused, and harassed by Strauss and/or by conditions at Larkins Hall.

25. Plaintiffs expected OSU, an esteemed institution of higher learning, to seek the truth about Strauss' conduct wherever the truth led the University.

26. Plaintiffs relied on OSU to confront and stop Strauss' sexual abuse of Plaintiffs and other male OSU students.

27. Plaintiffs relied on OSU to stop the rampant sexual harassment that student-athletes, particularly the wrestling team, had to endure in Larkins Hall between 1978 and 1998.

28. OSU betrayed Plaintiffs' trust and utterly failed to meet the legal and ethical obligations it owed to Plaintiffs and other OSU students. At all times relevant to this Complaint, OSU officials with authority to institute corrective measures actively concealed, failed to disclose, and showed deliberate indifference towards circumstances that indicated Strauss was sexually assaulting and abusing male OSU athletes he treated.

29. On information and belief, OSU personnel who failed to implement corrective measures despite having actual knowledge of: (a) the risk that Strauss was sexually assaulting students, and (b) the sexually hostile environment Larkins Hall presented to athletes on the teams housed there included (but were not limited to) Athletic Directors and Assistant Athletic Directors, Head Team Physicians, and team physicians (who were also faculty members).

30. At all times relevant to this Complaint, OSU maintained a culture of concealment, denial, and unwillingness to investigate sexual abuse and sexual harassment of male athletes at the University. This culture led to OSU's active concealment of and deliberate indifference towards continuous complaints and reports about Strauss' behavior and the conditions at Larkins Hall. Consequently, Strauss remained hidden in plain sight and continued to abuse Plaintiffs and other patients throughout his career at the University. Plaintiffs on teams housed in Larkins Hall continued to be harassed on a daily basis. Both of these threats to student safety remained unabated for *twenty years*.

31. Only within the past two years have Plaintiffs realized that Strauss' conduct constituted sexual assault or sexual abuse.

32. Only within the past two years have Plaintiffs had a reasonable basis for believing that OSU had actual knowledge of the risk Strauss presented to the student-athletes he treated.

33. Only within the past two years have Plaintiffs had a reasonable basis for believing OSU intentionally concealed or showed deliberate indifference to the threat Strauss posed to them.

34. Only within the past two years have the Plaintiffs who competed in wrestling, gymnastics, and swimming come to learn what OSU administrators in a position to take corrective measures knew and failed to do about the conditions in Larkins Hall.

35.     Even if Plaintiffs had realized more than two years ago that Strauss' conduct constituted sexual assault and sexual abuse, Plaintiffs would have had no reasonable basis for alleging or concluding that OSU caused them to suffer a separate and independent harm from what Strauss had inflicted on them.  Strauss harmed Plaintiffs by sexually assaulting and abusing them.  OSU independently harmed Plaintiffs by failing to protect them from Strauss despite knowing Strauss was substantially likely to be a sexual predator.  Not until within the past two years would Plaintiffs' due diligence have allowed them to reasonably infer: (a) what OSU knew about Strauss while Strauss was on the faculty; or (b) what OSU did or failed to do with that information.

36.     Likewise, not until within the past two years would the Plaintiffs whose teams practiced in Larkins Hall, including wrestling, swimming, and gymnastics, have known: (a) the extent of OSU's institutional knowledge about the conditions in Larkins Hall; or (b) what OSU did or failed to do with that information.

## THE PARTIES

37.     Defendant The Ohio State University was at all relevant times and continues to be a public university organized and existing under the laws of the State of Ohio.

38.     Defendant OSU receives, and at all relevant times received, federal financial assistance. Defendant is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*

39.     Plaintiffs were enrolled at OSU as students during Strauss' employment with OSU.

40.     Plaintiffs participated in OSU intercollegiate sports teams while enrolled at OSU.

41.     Plaintiffs received financial assistance from OSU that was linked to their participation on OSU's intercollegiate sports teams.

42.     Plaintiff Michael DiSabato is a resident of the State of Ohio.

43.     M. DiSabato attended OSU and wrestled from 1987-1991. DiSabato was a Big 10 Medal of Honor winner based upon his wrestling and academic accomplishments.

44.     Strauss sexually assaulted DiSabato an estimated 45-50 times.

45.     Strauss required DiSabato to expose his genitalia for every office visit, regardless of DiSabato's medical complaint.  Strauss would cup and fondle DiSabato's testicles and handle them for extended period of time.

46.     Strauss also performed unnecessary or overly invasive rectal exams on DiSabato. These exams embarrassed and humiliated DiSabato.

47.     Although DiSabato found Strauss' examination methods embarrassing and humiliating and wondered why they were necessary, he did not appreciate that Strauss' clinical actions constituted sexual assault or sexual abuse. Strauss offered a pretextual medical explanation for everything he did to DiSabato.

48.     Plaintiff John Doe No. 1 is a resident of the State of Ohio.

49.     John Doe No. 1 wrestled for OSU in 1985.

50.     Strauss sexually assaulted/abused John Doe No. 1 once while performing what Strauss said was a routine physical.  After performing a hernia check, Strauss told John Doe No. 1 to drop his pants and then conducted a very intense and extensive rectal exam.

51.     Plaintiff John Doe No. 2 is a resident of the State of Missouri.

52.     John Doe No. 2 played football and attended OSU from 1990-1994.

53.     John Doe No. 2 was sexually assaulted/abused by Strauss four times. All instances occurred during his pre-season physicals for football. Strauss fondled Plaintiff John Doe No. 2's genitals for extended periods of time and said he was checking for a hernia. Strauss lifted up Plaintiff's penis and put his face extremely close to it, supposedly also to check for signs of a hernia.

54.     John Doe No. 2 reported Strauss' conduct to Billy Hill, a team trainer. Plaintiff wondered whether Strauss' methods were the norm. Hill did not tell Plaintiff that Strauss' conduct was medically improper or sexually abusive. Plaintiff reasonably inferred that Strauss was conducting a legitimate medical exam and that he was not qualified to question the appropriateness of Strauss' examination methods.

55.     John Doe No. 3 is a resident of the State of Ohio.

56.     John Doe No. 3 attended OSU from 1988-1991 and was a member of OSU's football team. Strauss sexually assaulted/abused John Doe No. 3 on at least four occasions by fondling his genitals and lingering around his groin and genitals. When fondling John Doe No. 3, Strauss also asked inappropriate questions such as how it felt and whether John Doe No. 3 liked what Strauss was doing.

57.     John Doe No. 3 reported Strauss' conduct to Billy Hill, a team trainer. Hill did not inform John Doe No. 3 that Strauss' conduct was medically improper or sexually abusive. John Doe No. 3 reasonably inferred that Strauss was conducting a legitimate medical exam and/or that he was not qualified to judge whether Strauss' behavior during the examination was medically appropriate.

58.     John Doe No. 4 is a resident of the State of Ohio. John Doe No. 4 attended and played football for OSU between 1986-1991. Strauss sexually assaulted/abused John Doe No. 4 multiple times by groping his genitals for extended periods of time.

59.     While examining John Doe No. 4, Strauss also asked how it felt and whether John Doe No. 4 liked it.

60.     John Doe No. 5 is a resident of the State of Ohio. John Doe No. 5 wrestled and attended OSU from 1986-1990.

61.     Strauss sexually assaulted/abused John Doe No. 5 three or four times. No matter why John Doe No. 5 was seeing Strauss, Strauss would require him to drop his shorts and expose himself.

62.     John Doe No. 6 wrestled for OSU from 1978-1981. John Doe No. 6 was sexually assaulted/abused by Strauss more than twenty times.

63.     Strauss would hold John Doe No. 6's testicles a long time while asking him to cough. Strauss would make John Doe No. 6 drop his pants every time he saw Strauss for an injury, regardless of John Doe No. 6's medical complaint.  For instance, Strauss made John Doe No. 6 drop his pants and fondled John Doe No. 6's genitals when Plaintiff saw Strauss for *finger* and *eye* injuries.

64.     Strauss told John Doe No. 6 he was checking lymph nodes, for skin problems, and for other health conditions.

65.     Plaintiff John Doe No. 7 is a resident of the State of South Carolina.

66.     John Doe No. 7 swam and attended OSU from 1980-1985.

67.     Strauss sexually assaulted/abused John Doe No. 7 an estimated 25 times out of 30 doctor's appointments.

68.     Strauss fondled John Doe No. 7's testicles for an inappropriately long amount of time and caressed the foreskin of his penis. Strauss also gave John Doe No. 7 an unwarranted and overly invasive rectal exam.

69.     One day, when John Doe No. 7 was naked and alone in the locker room, Strauss came up and grabbed and squeezed John Doe No. 7's breast in a playful manner.

70.     John Doe No. 8 is a resident of the State of Ohio.

71.     John Doe No. 8 played football and attended OSU from 1988-1992. Strauss sexually assaulted/abused John Doe No. 8 on five different occasions when performing physicals. At the time, John Doe No. 8 thought Strauss was performing a lengthy and very "aggressive" physical examination of his genitals.

72.     John Doe No. 9 is a resident of the State of Ohio.

73.     John Doe No. 9 played football and attended OSU from 1988-1992.

74.     John Doe No. 9 was sexually assaulted by Strauss two or three times. Strauss wanted to do a full physical on him regardless of the injury or complaint. John Doe No. 9 felt uncomfortable, embarrassed, and unsettled by the way Strauss handled his genitalia. He did not understand what was medically appropriate. He mentioned Strauss to some teammates. They shared their collective opinion that Strauss was a "weirdo."

75.     John Doe No. 10 is a resident of the State of Delaware.

76.     John Doe No. 10 played football and attended OSU from 1994-1998.

77.     Strauss sexually assaulted/abused John Doe No. 10 on three occasions when handling his genitals and feeling his crotch.

78.     John Doe No. 10 reported this behavior to trainer Billy Hill. Hill did not inform John Doe No. 10 that Strauss' conduct was medically improper or sexually abusive. John Doe

No. 10 reasonably inferred that Strauss was conducting a legitimate medical exam and/or that he was not qualified to judge whether Strauss' behavior during the examination was medically appropriate.

79.     Plaintiff John Doe No. 11 is a resident of the State of Ohio.

80.     Plaintiff John Doe No. 11 attended OSU from 1987-1991 and participated in two varsity sports, one of which was football.

81.     Strauss sexually assaulted/abused Plaintiff John Doe No. 11 two or three times. Every time Plaintiff John Doe No. 11 was seen by Strauss, Strauss required a hernia exam that lasted a long time even though Plaintiff John Doe No. 11 had not complained about any injury to his groin or genitals.

82.     John Doe No. 12 is a resident of the State of Ohio.

83.     John Doe No. 12 played football and attended OSU while Strauss worked at OSU.

84.     Strauss sexually assaulted/abused John Doe No. 12 on four occasions by groping his genitals and groin area. Strauss conducted very long genital exams and commented on how John Doe No. 12's genitals felt in his hands.  Strauss also asked John Doe No. 12 whether it felt good as Strauss fondled his genitals.

85.     John Doe No. 13 played football and attended OSU from 1980-1984.

86.     Strauss sexually assaulted/abused John Doe No. 13 on three-to-five occasions. Simple hernia checks turned into examinations of John Doe No. 13's penis and testicles that lasted *between ten and fifteen minutes*.  Strauss got his face very close to John Doe No. 13's genitals when "examining" him.  John Doe No. 13 assumed it was a legitimate medical examination at the time because Strauss' had a reputation for performing extra-thorough genital examinations. Some football players openly referred to Strauss as "Dr. Drop Your Drawers."

87. John Doe No. 14 is a resident of the State of Ohio.

88. John Doe No. 14 played football three years, beginning in 1989.

89. Strauss sexually assaulted/abused John Doe No. 14 three of the five times he treated him. All instances occurred under the pretext of pre-season physical hernia checks.

90. John Doe No. 15 is a resident of the State of Ohio.

91. John Doe No. 15 played football and attended OSU from 1989-1992.

92. Strauss sexually assaulted/abused John Doe No. 15 on several occasions by performing lengthy and also unnecessary genital exams. For example, when John Doe No. 15 saw Strauss for a common cold and for a sore throat, Strauss insisted on a genital exam. John Doe No. 15 felt violated by the way Strauss performed his examinations.

93. John Doe No. 16 is a resident of the State of Ohio.

94. John Doe No. 16 played football and attended OSU from 1989-1992

95. Strauss sexually assaulted/abused John Doe No. 16 all three times he performed pre-season physicals on John Doe No. 16. Strauss spent a long time fondling John Doe No. 16's testicles and asked him how it felt while groping Plaintiff.

96. John Doe No. 16 discussed Strauss' conduct to trainer Billy Hill. Hill gave no indication Strauss' methods medically improper. John Doe No. 16 reasonably inferred that Strauss was conducting a legitimate medical exam and/or that he was not qualified to judge whether Strauss' behavior during the examination was medically appropriate.

97. *Strauss' groping and fondling upset John Doe No. 16 to the point that he has not gotten another physical since 1992.*

98. John Doe No. 17 is a resident of the State of Ohio.

99.     John Doe No. 17 played football and another varsity sport and attended OSU from 1994-1999.

100.     Strauss treated John Doe No. 17 approximately 4 or 5 times. Strauss required genital exams even if he had recently examined John Doe No. 17's genitals. As Plaintiff puts it, "There was a genital exam for everything."

101.     John Doe No. 18 is a resident of the State of Ohio.

102.     John Doe No. 18 played football and attended OSU from 1984-1988.

103.     Strauss sexually assaulted/abused John Doe No. 18 about five or six times. Strauss conducted "overly aggressive" physicals. He touched John Doe No. 18 more aggressively and longer than what John Doe No. 18 thought necessary for the exam. John Doe No. 18 felt so uncomfortable after the exams that he said something to the trainers, including Billy Hill, after both his freshman and sophomore year exams. Hill did not inform John Doe No. 18 that Strauss' conduct was medically improper or sexually abusive. John Doe No. 18 reasonably inferred that Strauss was conducting a legitimate medical exam and/or that he was not qualified to judge whether Strauss' behavior during the examination was medically appropriate.

104.     John Doe No. 18 stopped complaining after his sophomore year. Nothing changed. He did not want to be a trouble maker. He did not want to jeopardize his scholarship. Strauss' unwanted fondling continued.

105.     John Doe No. 19 is a resident of the State of Ohio.

106.     John Doe No. 19 wrestled for OSU one year, 1983-84. Strauss sexually assaulted/abused John Doe No. 19 twice while examining his genitals. Strauss performed hernia checks with his face extremely close to Plaintiff's genitals.

15

107.    Strauss also sexually assaulted John Doe No. 19 by conducting an unnecessary rectal exam and then rotating his finger to press hard on John Doe No. 19's prostate.  More than thirty-four years later, John Doe No. 19 remembers word-for-word Strauss telling him, "I can learn more from a thermometer in the mouth and a finger up the butt than with all my other tools."

108.    John Doe No. 19 experienced constant harassment in Larkins Hall. Whether in the showers or bathroom he was ogled. He could feel stares from the voyeurs. John Doe No. 19 was regularly propositioned to meet elsewhere for sex and found notes in his locker asking him to meet up for sex. When he complained to an assistant coach about the constant sexual harassment in Larkins Hall, he was told to "grow up," that he was "not in high school anymore."  He had come from a small town and thought he was out-of-touch with college norms.

109.    John Doe No. 19 was so discouraged about the environment of Larkins Hall that he stopped wrestling, which was his passion, and did not return to OSU.

110.    John Doe No. 20 is a resident of the State of Georgia.

111.    John Doe No. 20 played football and attended OSU from 1987-1990.

112.    Strauss sexually assaulted/abused John Doe No. 20 four times – every pre-season physical. He groped John Doe No. 20's groin and genitals for an extended period of time and asked John Doe No. 20 how it felt and whether he liked it.

113.    John Doe No. 20 told team trainer Billy Hill about Strauss' conduct. Hill did not inform John Doe No. 20 that Strauss' conduct was medically improper or sexually abusive. Plaintiff John Doe No. 20  reasonably inferred that Strauss was conducting a legitimate medical exam and/or that he was not qualified to judge whether Strauss' behavior during the examination was medically appropriate.

114.    John Doe No. 21 is a resident of the State of Georgia.

115.    John Doe No. 21 played football and attended OSU from 1992-1996.

116.    Strauss sexually assaulted/abused John Doe No. 21 three times during physical exams. Strauss spent a long time manipulating John Doe No. 21's genitals and groin and the experience felt creepy. John Doe No. 21 believed that college physicals were just more extensive than the physicals he had experienced for high school sports.

117.    John Doe No. 22 is a resident of the State of Texas.

118.    John Doe No. 22 played football and another varsity sport and attended OSU from 1986-1991.

119.    Strauss sexually assaulted/abused John Doe No. 22 one time by groping him while performing a physical.

120.    John Doe No. 23 is a resident of the State of Ohio.

121.    John Doe No. 23 wrestled at OSU and attended from 1986-1991.

122.    John Doe No. 23 estimates Strauss sexually assaulted/abused him between 40-50 times. Every doctor visit started with a hernia check regardless of John Doe No. 23's injury or the purpose for John Doe No. 23's visit. Strauss fondled John Doe No. 23's scrotum during the hernia checks.

123.    Also, Strauss would watch wrestling practices, be the first one in the shower after practice ended, and stay in the shower area until the last wrestler finished showering.

124.    John Doe No. 24 is a resident of the State of Vermont.

125.    John Doe No. 24 was a gymnast and attended OSU from 1981-1986.

126.     Strauss sexually assaulted/abused John Doe No. 24 approximately six times. Strauss fondled his genitals while supposedly checking for hernias. When John Doe No. 24 was experiencing a genital irritation/rash, Strauss gave him a rectal exam and inserted his finger.

127.     Strauss also showered with John Doe No. 24 and the other gymnasts and ogled them while making small-talk in the locker room after showering.

128.     John Doe No. 25 is a resident of the State of Ohio.

129.     John Doe No. 25 played football at OSU during Strauss' tenure.

130.     Strauss sexually assaulted/abused John Doe No. 25 four times.  John Doe No. No. 25 heard teammates call Strauss "Mr. Long Fingers" and "Mr. Touchy Feely." During physical exams, Strauss groped John Doe No. 25's genitals for an extended time and asked how it felt.

131.     John Doe No. 25 confided in Billy Hill regarding Strauss' conduct. Hill did not inform John Doe No. 25 that Strauss' conduct was medically improper or sexually abusive. John Doe No. 25 reasonably inferred that Strauss was conducting a legitimate medical exam and that he was not qualified to question the appropriateness of Strauss' examination methods.

132.     John Doe No. 26 is a resident of the State of Ohio.

133.     John Doe No. 26 played football and attended OSU from 1984-1989.

134.     Strauss sexually assaulted/abused John Doe No. 26 five times, all during physicals.  Strauss touched and grabbed his genitals excessively and kept asking, "How does it feel? Do you like it?" John Doe No. 26 told Head Trainer Billy Hill at least four times what Strauss had said and how much it bothered him.

135.     John Doe No. 26 heard some of his teammates asking for another doctor because Strauss was grabbing their genitals. Nothing changed.

136.    John Doe No. 27 is a resident of the State of Ohio.

137.    John Doe No. 27 played football and attended OSU from 1989-1993.

138.    Strauss sexually assaulted/abused John Doe No. 27 twice by groping his genitals during physical exams.  The first time it occurred, John Doe No. 27 did not say anything to Strauss.  He heard other players talking about Strauss' examinations after the physicals were completed but did not speak up. Instead he told Head Trainer Billy Hill how uncomfortable Strauss made him feel.  Nothing came of it.

139.    When Strauss  began groping John Doe No. 27 during John Doe No. 27's second physical, the Plaintiff ordered Strauss to stop. Strauss did. John Doe No. 27 remains very embarrassed about how Strauss fondled him.

140.    John Doe No. 28 is a resident of the State of Ohio.

141.    John Doe No. 28 played football at OSU during the 1987-1991 seasons.

142.    Strauss sexually assaulted/abused John Doe No. 28 four times. While conducting genital exams Strauss would ask if he liked it and how it felt. Strauss also fondled John Doe No. 28's penis.  Once John Doe No. 28 noticed that Strauss had an erection while fondling him.

143.    John Doe No. 29 played football at OSU during the 1993-1997 seasons.

144.    Strauss sexually assaulted/abused John Doe No. 29 three times by grabbing his genitals and groin. Two of the assaults occurred during physicals. The third time was during a quadriceps and groin injury exam.  Massaging and groping John Doe No. 29's groin and genitals, Strauss lingered and asked John Doe No. 29 whether he liked it and how it felt.

145.    John Doe No. 29 told Head Trainer Billy Hill. Nothing changed.  Plaintiff was afraid to go over Hill to the coach because he feared losing his scholarship.

146.    John Doe No. 30 is a resident of the State of Missouri.

147.     John Doe No. 30 played football at OSU during the 1989-1993 seasons.

148.     Strauss sexually assaulted/abused John Doe No. 30 five times by fondling John Doe No. 30's groin and genitals.  While fondling John Doe No. 30, Strauss smiled and asked if he enjoyed having Strauss's hands on his "privates."

149.     John Doe No. 30 told Head Trainer Billy Hill about Strauss' conduct. John Doe No. 30 reasonably inferred that Strauss was conducting a legitimate medical exam and/or that he was not qualified to judge whether Strauss' behavior during the examination was medically appropriate.

150.     John Doe No. 31 is a resident of the State of Ohio.

151.     John Doe No. 31 played football for OSU during the 1989-1993 seasons.

152.     Strauss sexually assaulted/abused John Doe No. 31 four or five times by continuously rubbing John Doe No. 31's groin and testicles during physicals and holding his testicles for a very long time.  While fondling John Doe No. 31, Strauss commented about John Doe No. 31's sex life on campus. John Doe No. 31 felt helpless, embarrassed, and scared. He did not have the education, training, or experience to deem Strauss' exam techniques abnormal.

153.     John Doe No. 31 told Billy Hill about Strauss' behavior several times. Hill gave no indication Strauss' methods medically improper. John Doe No. 31 reasonably inferred that Strauss was conducting a legitimate medical exam and/or that he was not qualified to judge whether Strauss' behavior during the examination was medically appropriate.

154.     John Doe No. 32 is a resident of the State of Ohio.

155.     John Doe No. 32 wrestled for OSU one year during the 1990s while Strauss was employed at OSU. The precise year is being withheld from the pleading to preserve John Doe No. 32's anonymity.

156.     Strauss sexually assaulted/abused John Doe No. 32 twice when John Doe No. 32 reported to him with an ankle injury. On both occasions, Strauss had John Doe No. 32 take off all his clothes for the examination. Strauss then fondled John Doe No. 32's testicles and penis. He did not wear gloves.

157.     John Doe No. 32 was also subjected to the hostile environment of Larkins Hall. Strauss also gawked at John Doe No. 32 in the wrestling locker room.

158.     John Doe No. 33 is a resident of the State of Kentucky.

159.     Strauss sexually assaulted/abused John Doe No. 33 five times during physicals. Strauss had Plaintiff turn his head and cough for a hernia check, but then continued to massage Plaintiff's groin and genitals.

160.     John Doe No. 33 told Billy Hill what had happened. Nothing changed.

161.     John Doe No. 34 is a resident of the State of Ohio.

162.     John Doe No. 34 played football at OSU from 1991-1995.

163.     Strauss sexually assaulted/abused John Doe No. 34 four times. Strauss grasped his genitals for extended periods during exams. On the last exam, Strauss asked John Doe No. 34 whether he could kiss John Doe No. 34's penis.

164.     John Doe No. 34, like many other Plaintiffs, told Billy Hill what had happened. No one did anything to stop Strauss.

165.     John Doe No. 35 is a resident of the State of Michigan.

166.     John Doe No. 35 played football at OSU during the 1990-1994 seasons.

167.     Strauss sexually assaulted/abused John Doe No. 35 three or four times. Each occasion occurred during a pre-season physical, when Strauss gave Plaintiff prolonged genital exams.

168. Freshman year, Plaintiff reported the situation to the Head Trainer. The Trainer laughed it off and acted as though he did not believe John Doe No. 35. Plaintiff heard other teammates make similar complaints about Strauss.

169. John Doe No. 36 is a resident of the State of Texas.

170. John Doe No. 36 played volleyball during the 1983 and 1984 seasons.

171. Strauss sexually assaulted/abused John Doe No. 36 at least four out of the approximately eight times he examined John Doe No. 36. When being examined by Strauss, John Doe No. 36 was required to strip naked. Strauss sat directly in front of John Doe No. 36 with his face directly in front of John Doe No. 36's genitals. Strauss said he was going to check for a hernia, then cupped and stroked John Doe No. 36's testicles and penis, moving up and down with his bare hand. John Doe No. 36 also remembers Strauss staring at the volleyball players as they walked into the locker room after practice.

172. John Doe No. 36 recalls his coach making an offhand joke to the players about them having to get physicals from Strauss.

<u>STRAUSS</u>

173. OSU employed Richard Strauss, M.D., as a faculty member from September 1978 until March 1, 1998.

174. In 1978, Strauss was hired as an Assistant Professor of Medicine in the Pulmonary Disease Division of the Department of Medicine.

175. By 1980, Strauss was Associate Director of the Sports Medicine Program. In 1981, Strauss began an appointment in the Athletics Department and expanded his clinical duties to the Sports Medicine Clinic at University Health Services. By 1982, Strauss' primary affiliation was with the Department of Preventive Medicine.

176. OSU granted Strauss tenure as an associate professor in 1983. OSU made Strauss a full professor with tenure in 1992. Strauss voluntarily retired in March 1998 and was approved by the Board of Trustees for emeritus status in the School of Public Health. Emeritus status was granted without the review or approval of the Dean of the College of Medicine and Public Health. (Report, p. 32,33.)

177. Throughout his employment, Strauss provided medical services to various OSU sports teams. Strauss initially served as a team physician for the wrestling, swimming, and gymnastics teams, which were based at Larkins Hall. At that time, Larkins Hall was OSU's physical education building and aquatics facility.

178. "Over the years, Strauss' responsibilities as a team physician expanded beyond just the teams based out of Larkins, and included assignments with teams and in facilities across campus[,]" (Report at 2.) Around 1980, Strauss began treating patients at the Sports Medicine Clinic at Student Health Services. He was ultimately appointed Chief Physician of the Sports Medicine Clinic. As time went on, Strauss treated students "who participated in a wide range of sports including hockey, cheerleading, volleyball, soccer, track, golf, baseball, tennis, water polo, and football." (*Id.* at 35).

179. Strauss' appointment with Student Health ended in 1996 following an investigation into student complaints about Strauss' sexual misconduct during medical exams.

<u>STRAUSS' ACTS OF SEXUAL ASSAULT AND ABUSE</u>

180. Strauss abused Plaintiffs and OSU students in one or more of the following ways (as categorized by the Report):

   a. In the context of a medical examination that caused the student to reach ejaculation or nearly reach ejaculation;

b.   In the context of a medical examination that caused the student to reach erection or nearly reach erection;

c.   Unnecessary fondling or groping of genitals in the context of a medical examination, or medically unnecessary examinations of the genitals or rectum.

d.   Examination techniques that included: unnecessary nudity; excessive touching of non-genital/non-rectal areas of the student's body; inappropriate verbal commentary or sexually charged questioning; lack of medical gloves for genital examinations; unnecessarily invasive physical positions; medical treatment outside a clinical setting; and *quid pro quo* arrangements; and

e.   Inappropriate and sexually abusive conduct outside of the examination room, including showering alongside student-patients, loitering in student-athletes'' locker rooms and engaging in voyeuristic behavior, and initiating fraternization with patients. (Report at 40)

181.   Strauss committed these acts of sexual abuse and harassment consistently and on a daily basis throughout his career at OSU.

182.   Strauss committed these acts of sexual abuse while an OSU faculty member.

WHY PLAINTIFFS' HAD DIFFICULTY REALIZING OR
REPORTING STRAUSS' CONDUCT AS SEXUALLY ABUSIVE

183.   Plaintiffs were vulnerable to Strauss' sexual abuse and many were not able to identify Strauss' conduct as sexual abuse when it occurred. Many factors caused this result, as set forth below.

184.   Plaintiffs were treated by Strauss in his capacity as a Team Physician through the Athletics Department or at the Sports Medicine Clinic. He was the person officially designated to treat them.

185.     Plaintiffs had to pass a pre-season physical in order to participate in their sport.

186.     Before attending OSU, some Plaintiffs had not seen a doctor without their parents being present.

187.     Plaintiffs tended to attribute Strauss' surprisingly "rigorous" genital and rectal examinations to the fact that the physical requirements of intercollegiate sports were much greater than for high school competition.

188.     Plaintiffs were sexually assaulted/abused by Strauss in the context of a purported medical examination, such as when seeing him for a pre-season physical or for a sports-related injury.  They came into contact with him under legitimate circumstances and were more likely to interpret what took place in the examination room within that framework of legitimacy.

189.     When Strauss abused Plaintiffs, male sexual abuse was not a commonly acknowledged problem or a commonly discussed topic among non-educators or people outside the fields of medicine and counseling.

190.     Plaintiffs were brought up to believe that doctors are trustworthy and do not intentionally hurt their patients.

191.     Plaintiffs were brought up to believe that a "good" patient is a compliant patient.

192.     Plaintiffs treated by Strauss were placed in a vulnerable position, both physically and emotionally, when Strauss examined them. They were not psychologically predisposed to question Strauss' clinical practices.

193.     There was a huge disparity between Strauss' medical knowledge and the Plaintiffs.  They had no standing to challenge his explanations for the things he did to them.

194.     Plaintiffs were on Strauss' "turf" when he examined them in his office with the door closed.  Strauss' psychological and educational advantage over each athlete in the

examination room was just as great as the athlete's physical advantage over Strauss would have been if they had competed against each other in the athlete's chosen sport.

195.    Plaintiffs went into exams, particularly pre-season physicals, expecting their doctors to touch them.  They knew that doctors often have to touch their patients as part of their work.  Plaintiffs had neither the experience nor education to know the limits of appropriate physical contact during medical examinations.

196.    Plaintiffs attended OSU believing its doctors and medical faculty would inform patients about the medical services they provided to them to the extent they were legally or ethically required to do so.

197.    Plaintiffs entered Strauss' examination rooms presuming that what went took place in a doctor's office was supposed to be confidential. Even under the most normal circumstances, Plaintiffs wanted their genital or rectal examinations to remain confidential because the such topics were embarrassing to discuss. When Strauss' examinations became overly aggressive or lingered too long in intimate areas, it made more sense for Plaintiffs to chalk a feeling that something was wrong up to them feeling unwarranted embarrassment or shame. The alternative was to accuse a tenured professor of committing sexual assault and to risk one's athletic scholarship.

198.    Plaintiffs maintained a special relationship with OSU because they were attending on athletic scholarships. Many needed their athletic scholarship to stay in school.  They despised Strauss' medical exams but were willing to endure them if that was a requirement to keep their scholarships.

199. Plaintiffs maintained a team mentality. No teammate wanted to complain about something he believed his other teammates were having to endure, no matter how unpleasant the experience.

200. Some Plaintiffs feared being ridiculed and ostracized if they complained to teammates about the sexual undertones they perceived during Strauss' medical examinations and their teammates did not admit to having similar experiences with Strauss.

201. OSU teams always compete at the highest possible level. Plaintiffs were therefore expected to perform at their best. That required Plaintiffs to make sacrifices and go the extra mile with every aspect of their training and preparation. Plaintiffs were not in a position to judge whether a reputed world-class sports physician's overly thorough examinations were improper just because things felt wrong or overly invasive. Plaintiffs understood Strauss to be an elite sports doctor, just like they were elite athletes. Strauss' "thoroughness" felt, extreme, embarrassing, and humiliating to the Plaintiffs, but Plaintiffs believed his physicals were a difficult step forward in their quest for excellence.

202. Plaintiffs, as athletes, were expected to be tough and not to complain.

203. OSU controlled every aspect of how Strauss interacted with the Plaintiffs. OSU provided the facilities, designated Strauss as their doctor, and controlled their scholarships. Plaintiffs had no say in who treated them.

204. None of the Plaintiffs had/have received medical education or training, so they had/have no knowledge of medical examination techniques for diagnosing or treating hernias, swollen lymph nodes, or hamstring tears, or medical conditions of the penis, testicles, rectum, prostrate, or anus.

205.    None of the Plaintiffs have been trained or educated as to what constitutes inappropriate physical conduct in the context of a doctor-patient relationship.

206.    None of the Plaintiffs have ever been educated or trained regarding what comments or questions are inappropriate for a physician to make during a medical examination.

207.    When Strauss sexually assaulted/abused Plaintiffs in a clinical setting, many of them felt confused as to whether abuse had, in fact, occurred.  While Plaintiffs had strong negative emotions and many felt his exams were medically inappropriate, they also understood that feelings are not facts. Many of them did not appreciate until within the past two years that Strauss touched them in an unlawful manner.

208.    Plaintiffs were expressly or impliedly misled by OSU trainers, coaches, and employees in the Athletics Department into believing that Strauss' sexually abusive examination methods and statements, though unpleasant and embarrassing, were medically acceptable practices.

209.    Plaintiffs were unlikely to think Strauss was committing an act of sexual violence by manipulating their genitals for extended periods because everyone talked openly about Strauss' over-the-top Strauss' genital exams. To a young college student, how could something discussed so openly actually be a criminal act?  Strauss' insistence upon his rigorous genital and rectal exams became an accepted, albeit despised, part of being treated.  Plaintiffs' only recourse was to make nervous jokes their powerlessness over their predicament. A Plaintiff recalls that during his freshman physical, teammates outside Strauss' closed examination room laughed that it was Plaintiff's "first time" – as though Plaintiff was losing his virginity.

210.    Not until within the past two years have Plaintiffs had a reasonable basis for believing OSU had actual knowledge Strauss was sexually abusing male students in a clinical setting.

211.    Not until within the past two years have Plaintiffs had a reasonable basis for believing that OSU concealed or remained deliberately indifferent to the substantial risk that Strauss was sexually abusing them and other male OSU students, particularly student-athletes.

212.    Left to their own means, Plaintiffs had no reasonable way of knowing that OSU had actual knowledge Strauss was sexually abusing male students in a clinical setting.  Plaintiffs also had no way of learning the awful truth about what OSU knew and when, or how OSU chose to permit their continued sexual abuse by Strauss. No exercise of reasonable due diligence would have revealed to them how OSU's acts and omissions caused Plaintiff to suffer independent injuries from the injuries caused by Strauss.

OSU'S DELIBERATE INDIFFERENCE TOWARDS STRAUSS' CONDUCT

213.    "Beginning as early as Strauss' first year at OSU – and persisting throughout his nearly two decades at the school – students and University staff reported and referred complaints about Strauss to various University employees." (Report at 2).

214.    On information and belief, at all times relevant to this Complaint, persons with the authority to cut-off Strauss' access to patients, to prevent Strauss from sexually abusing patients in a clinical setting, or to implement other corrective measures had actual knowledge there was a substantial likelihood that Strauss was sexually assaulting and abusing male student-athletes and other male OSU students.

215.    As early as 1979, OSU officials with authority to institute corrective measures had information indicating that Strauss posed "a substantial risk of sexual abuse" to male athletes

on OSU's intercollegiate sports teams. Among other things, "[p]ersonnel in the University's Sports medicine program and Athletics Department were aware that Strauss was conducting genital examinations on male athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present for these protracted genital examinations." (Report at 2)

216.    Through administrators, faculty, and staff, OSU had actual notice of Strauss' sexually abusive conduct. OSU, however, dismissed, disregarded, minimized, refuted, denied, silenced, and even concealed complaints about Strauss' sexual misconduct.  At best, OSU chose not to act on information that alerted University faculty, staff, and administrators to a substantial risk that Strauss was sexually abusing Plaintiffs and other male OSU athletes. On information and belief, OSU personnel who were alerted to compelling evidence of Strauss' sexually predatory conduct, but failed to take meaningful action that could have prevented Plaintiffs' injuries, include: Athletic Directors, Assistant Athletic Directors and Associate Athletic Directors; and Head Team Physicians and several team physicians (who were also faculty members).

217.    As early as 1979, personnel in the Athletics Department and in the University's Sports Medicine Program knew that Strauss conducted prolonged genital examinations on male students and refused to allow any OSU personnel to witness the examinations. Such personnel also knew "that Strauss showered alongside the male students at Larkins Hall – a practice unique to Strauss among the other team physicians and a practice that the student-athletes repeatedly complained about to their coaches." (Report at 2)

218.    Additionally, nurses at Student Health Services worried that Strauss was engaging in sexual conduct with patients because he often showed up unannounced to treat patients not on

the schedule, took unusually long times examining them, conducted examinations behind closed

doors, and failed to fill out medical records documenting the medical services he provided.

219.    Strauss was never disciplined for failing to create or complete medical records,

even though such records are standard medical practice and important to providing continuity of

care.

220.    By failing to insist that Strauss properly document all patient encounters, OSU

made it easy for Strauss to lie about every aspect of what took place during patient visits, or even

to deny that he had treated a particular student.

221.    OSU never told Strauss to stop showering with the athletes.

222.    OSU never ordered Strauss to have a third person in the room whenever he was

treating a male patient.

223.    OSU did not diligently follow up on any of the rumors or reports regarding

Strauss until 1994.

224.    At all relevant times, OSU also did not have a meaningful complaint or dispute

resolution process for allegations of faculty sexual harassment or abuse.  On information and

belief, OSU's faculty dispute procedure instructed complainants to try attempt an informal

resolution, i.e., a mediation, with the faculty member at issue before going through other

channels. It made no sense to recommend that victims of sexual abuse and harassment try to

negotiate a resolution with their abusers before seeking formal redress.

225.    At the end of the day, OSU failed the Plaintiffs and Strauss' other victims in every

imaginable way. It effectively gave Strauss a green light to prey upon male OSU students as he

saw fit.  Strauss took full advantage of every opportunity OSU gave him to assault, abuse, and

harass Plaintiffs and other male OSU students.

CONDITIONS AT LARKINS HALL

226.     During the Strauss years, Larkins Hall was in and of itself a constant source of sexual harassment for the male members of the athletics teams based inside it. Larkins Hall was home to a number of OSU sports teams, including wrestling, gymnastics, and swimming.  While Strauss participated in the sexual harassment that took place in Larkins Hall, he did not independently create the sexually hostile environment that affected the Plaintiffs.

227.     All male university faculty and students were allowed to use the same showers as the wrestling team.  An aggressively voyeuristic culture developed where certain non-athletes showered at the same time as wrestlers and soaped their groins vigorously while watching the wrestlers shower.  These individuals, including Strauss, leered at the wrestlers while watching them shower. The voyeurs often stayed in the showers until all the wrestlers had finished – often for an hour or longer.  Some of these individuals were OSU faculty. When the wrestling team changed its practice time, many of the voyeurs shifted their shower times to coincide with the wrestling team's new schedule.

228.     Wrestlers were frequently approached in the bathroom and showers and propositioned for sexual encounters.  One Plaintiff even had notes put in his locker asking him to meet up for sex.

229.     The harassment was so constant that Plaintiff DiSabato called getting to and from the showers "running the gauntlet."

230.     The wrestling room and spaces around it, including the bathroom and a stairwell, became a popular hangout for sexual encounters. Coach Hellickson found people having sex in a bathroom stall, in a stairwell, in the wrestling room, and in other areas. It was not uncommon for Hellickson to see people engaging in sexual activity inside Larkins Hall.

231. One of the Plaintiffs, a wrestler, was sexually assaulted by a man who grabbed and tried to fondle him as the wrestler was showering. The resulting physical confrontation worried Hellickson about the possibility things might get violent in the future. Larkins Hall was not a safe space for the male athletes who shared lockers or facilities with non-team members.

232. Hellickson repeatedly complained to OSU administrators about the environment in Larkins Hall because the conditions seriously impacted the psyche and morale of his wrestlers.

233. Hellickson requested a separate team shower area. OSU denied his request.

234. Hellickson begged to have the wrestling team moved to another building. OSU denied his request.

235. When Hellickson tried to get people to leave because they were ogling the wrestlers and taking hour-long showers, they said it was their right to shower when and for as long as they wanted. They denied staring at the wrestlers. University police would not make them leave.

236. Larkins Hall became an unsafe space and sexually hostile environment for wrestlers and some of the other male athletes whose teams were based there.

**CLAIM FOR RELIEF**
**COUNT I: Violation of Title IX**
**20 U.S.C. § 1681(a),** *et seq.*
**Heightened Risk Claim**

237. Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

238. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

239.    Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106. 34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

240.    As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

241.    Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

242.    Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment—including sexual assault—by school employees, students, and third parties.

243.    At all relevant times, OSU received federal financial assistance and is therefore subject to Title IX.

244.    Title IX required OSU to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

245.    Strauss committed his unlawful acts while working for OSU as a tenured faculty member, Team Physician, and Sports Medicine Physician.

246.    Strauss's sexual assault, abuse, molestation, and harassment of Plaintiffs—which included, among other things, fondling their testicles, fondling their penises, digitally penetrating their rectums, rubbing his erect penis on their bodies, and making inappropriate sexualized comments—was sex discrimination under Title IX.

34

247. OSU was required to promptly investigate and address Plaintiffs' (and other OSU students') allegations, reports and/or complaints of sexually abusive or harassing behavior by Strauss.

248. OSU had actual knowledge of the serial sexual assault, abuse, and molestation committed by Strauss.

249. Specifically, OSU knew about Strauss's sexual assault, abuse, and molestation through OSU personnel with authority to take corrective action to address it. Such personnel included, but were not limited to: Athletic Directors and Assistant Athletic Directors, and Head Team Physicians and several team physicians (who were also faculty members).

250. Throughout Strauss's 20-year tenure at OSU, students, student-athletes, and coaches conveyed complaints and concerns to OSU administrators and employees about Strauss's inappropriate sexual conduct.

251. Given the magnitude of Strauss's abuse—involving students and student- athletes he evaluated and treated over two decades—it would be implausible for OSU to claim that it did not know about Strauss's sexual abuse.

252. Nonetheless, OSU did nothing to address the complaints and concerns about Strauss.

253. OSU's failure to respond promptly and adequately to allegations of Strauss's abuse constitutes sex discrimination, in violation of Title IX.

254. By its acts and omissions, OSU acted with deliberate indifference to the sexual abuse and harassment that Plaintiffs and other male OSU students were experiencing. OSU's deliberate indifference included, without limitation:

a. Failing to respond to allegations of Strauss' sexual assault, abuse, and molestation;

b. Failing to promptly and adequately investigate allegations of Strauss's sexual assault, abuse, and molestation;

c. Requiring male athletes to see Strauss for annual physicals and medical treatment, despite widespread knowledge and complaints about Strauss's abuse;

d. Allowing Strauss (and other sexual predators) to roam freely in Larkins Hall;

e. Allowing Strauss to work as a physician in Student Health Services, despite widespread knowledge and complaints about Strauss's abuse of male student-athletes;

f. Failing to adequately supervise Strauss, after learning that he posed a substantial risk to the safety of male students and student-athletes;

g. Failing to require that Strauss properly document all patient encounters;

h. Failing to take corrective action to prevent Strauss from sexually assaulting, abusing, and molesting other students; and

i. Failing to have in place an effective sexual harassment policy that allowed students to bring complaints without first having to try to resolve complaints of sexual harassment informally with the alleged abuser.

255. OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Strauss's sexual misconduct caused Plaintiffs (and other male OSU students) to experience further sexual harassment and/or made them liable or vulnerable to it.

256. OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Strauss's sexual misconduct created a sexually hostile environment that

effectively denied Plaintiffs access to educational opportunities and benefits at OSU, including appropriate medical care.

257.    As a direct and proximate result of OSU's violation of Plaintiffs' rights under Title IX, Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; have sustained and continued to sustain loss of earnings and earning capacity; and have incurred various personal expenses.

**COUNT II: Violation of Title IX**
**20 U.S.C. § 1681(a),** *et seq.* **Hostile Environment**

258.    Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

259.    Plaintiffs whose teams were based out of Larkins Hall between 1978 and 1998 (collectively "Larkins Plaintiffs") were entitled to use the athletics facilities free from sexual harassment.  However, the pervading and constant sexual harassment they received within Larkins Hall created a hostile environment. The hostile environment these Larkins Plaintiffs suffered in Larkins Hall facilities was so severe, pervasive, and objectively offensive that it effectively barred said the Larkins Plaintiffs from access to numerous educational opportunities and benefits, including but not limited to: full use and enjoyment of practice facilities, showers, and locker rooms; and full use and enjoyment of their athletic scholarships and memberships on OSU's sports teams.

260.    The sexually hostile environment inside Larkins Hall during the aforementioned period constituted sex discrimination in violation of Title IX.

261.    Between 1978 and 1998, OSU officials in a position to implement corrective measures had actual knowledge that the Larkins Plaintiffs and other male OSU student-athletes were being subjected to a sexually hostile and abusive environment inside Larkins Hall.

262.    OSU owed the Larkins Plaintiffs a duty to investigate and remedy the conditions that made Larkins Hall a sexually hostile and abusive environment.

263.    Such OSU officials showed deliberate indifference towards the safety of the Larkins Hall Plaintiffs and other male student-athletes who used the Larkins Hall facilities between 1978-1998.

264.    OSU violated Title IX by failing to remedy the sexually hostile and abusive environment in Larkins Hall.

265.    As a direct and proximate result of OSU's violation of the Larkins Plaintiffs' rights under Title IX, the Larkins Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; have sustained and continued to sustain loss of earnings and earning capacity; and incurred various personal expenses.

**COUNT III: Violation of Title IX**
**20 U.S.C. § 1681(a),** *et seq.*
**Unlawful Retaliation**

266.    Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

267.    Title IX prohibits OSU from retaliating against persons who report violations of Title IX or make claims under Title IX's implied cause of action.

268.     Plaintiff DiSabato made claims and allegations protected by Title IX when he publicly discussed the conditions of Larkins Hall and asked OSU to investigate Strauss and the extent to which the University had known about Strauss' conduct. Plaintiff DiSabato made claims and allegations protected by Title IX when he testified before University officials on March 27, 2018.

269.     Plaintiff DiSabato has been subjected to numerous retaliatory acts since making public statements about these issues.

270.     On information and belief, soon after  DiSabato's testimony before OSU officials on March 27, 2018, DiSabato's picture was posted inside at least one OSU Athletic Department Facility and an email was sent out stating that DiSabato was not allowed inside certain OSU facilities.

271.     On information and belief, OSU's current Director of Athletics, Gene Smith, is the person who ordered that DiSabato be prevented from entering certain OSU facilities.  Thus, while the Report makes it clear that Strauss sexually abused more than 177 male students and OSU recently apologized for tolerating Strauss' behavior, last year OSU punished DiSabato for speaking publicly about Strauss' sexually abusive behavior and the sexually hostile environment in Larkins Hall.

272.     In November 2017, at a charity event DiSabato purchased tickets to the OSU spring football. About a week after testifying in March 2018, DiSabato was told he would be denied access to the game and was sent a check that reimbursed his charitable contribution.

273.     After DiSabato appeared on a story run by an ABC affiliate in July 2018, University employee Matt Finkes posted DiSabato's social security number on social media.  On

information and belief, Finkes released this information with the express or implied consent of OSU.

274. On information and belief, after that same story was broadcast on ABC, Finkes went on a local radio station and called DiSabato "a rat," among other things. A "rat" is a derogatory term for a person who is perceived as disloyal because he tells *the truth* about a fact or situation that wrongdoers want to keep secret. Finkes also said (paraphrased) that OSU would not simply lay down the way Michigan State had done.

275. The foregoing acts of Smith and Finkes, as well as OSU prohibiting DiSabato from entering the spring football game, constitute actionable retaliation under Title IX.

276. At all relevant times, OSU had actual or constructive knowledge of the fact that Finkes had disclosed DiSabato's social security number in a public forum. On information and belief, OSUhas violated its own internal policies and has subjected DiSabato to potential fraud and identity theft by disclosing DiSabato's social security number.

277. On information and belief, OSU has not taken disciplinary action against Finkes or Smith. OSU has therefore independently violated Title IX by ratifying the actions of Smith and Finkes to the extent their knowledge and actions did not originally constitute actions of OSU.

278. As a direct and proximate result of OSU's retaliation against him, DiSabato has suffered and continues to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life. Plainitff has also incurred various personal expenses.

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)     Enter judgment in favor of Plaintiffs on their claim for discrimination under Count I Title IX against Defendant The Ohio State University;

(b)     Enter judgment in favor of the Larkins Plaintiffs on their claim for discrimination under Count I Title IX against Defendant The Ohio State University;

(c)     Enter judgment in favor of Plaintiff Michael DiSabato on his claim for retaliation under Count III Title IX against Defendant The Ohio State University;

(d)     Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

(e)     Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment and The Ohio State University's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by The Ohio State University; and damages for past, present and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

(f)     Award Plaintiffs pre-judgment and post-judgment interest;

(g)     Award Plaintiffs their court costs and expenses, including attorney's fees, pursuant to 42 U.S.C. § 1988(b); and

(h)  Grant such other relief as this Court deems just and proper.

Respectfully submitted,


*/s/ Dennis P. Mulvihill*
**Dennis P. Mulvihill (0063996)**
**WRIGHT & SCHULTE, LLC**
23240 Chagrin Blvd., Suite 620
Cleveland, OH 44122-5468
(216) 591-0133
(216) 591-0622 facsimile
dmulvihill@yourlegalhelp.com


*/s/ Michael L. Wright*
**Michael L. Wright (0067698)**
**Robert L. Gresham (0082151)**
**Wright & Schulte, LLC**
130 W. 2nd Street, Suite 1600
Dayton, OH
(937) 435-7500
(937) 435-7511 facsimile
mwright@yourohiolegalhelp.com
rgresham@yourohiolegalhelp.com
*Counsel for Plaintiffs*